Stanley **FERBER, et al.**

v.

The **TRAVELERS CORPORATION,**
**Edward H. Budd; Richard J.**
**Shima; Thomas O. Thorsen.**

No. 2:90CV00842 (AHN).

United States District Court,
D. Connecticut.

Aug. 14, 1992.

class action brought by twenty-one share-holders ("the plaintiffs") against the Travelers Corporation ("Travelers"), Edward H. Budd ("Budd"), Thomas O. Thorsen ("Thorsen"), and Richard Shima ("Shima") (collectively, "the defendants"), for violations of federal securities laws and Connecticut common law. *See Ferber v. Travelers Corp.*, 785 F.Supp. 1101 (D.Conn.1991) (*"Ferber I"*). On January 9, 1992, the court granted the plaintiffs' request for leave to file a second consolidated amended complaint. *Id.* at 1111–12. The defendants, once again, move to dismiss the entire complaint, pursuant to Rules 9(b), 12(b)(1) and (b)(6), Fed.R.Civ.P. Once again, the court grants the motion in its entirety. This time, however, the action is dismissed with prejudice.

### I. *The Standard of Review*

#### A. Rule 12(b)(6)

When considering a Rule 12(b)(6) motion to dismiss, the court is required to accept as true all factual allegations in the complaint and draw inferences from these allegations in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Easton v. Sundram*, 947 F.2d 1011, 1014–15 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted. *See Hishon v. King & Spaulding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his or her claims." *United States v. Yale New Haven Hosp.*, 727 F.Supp. 784, 786 (D.Conn.1990), citing *Scheuer*, 416 U.S. at 232, 94 S.Ct. at 1683.

#### 1. *Scope of Review on a Motion to Dismiss*

In evaluating a motion to dismiss under Rule 12(b)(6), the court considers primarily the allegations in the complaint. However,

Robert I. Harwood, Joel C. Feffer, Wechsler Skirnick Harwood Halebian & Feffer, Robert P. Sugarman, Milberg Weiss Bershad Specthrie & Lerach, New York City, J. Daniel Sagarin, Britta S. Schneider, Hurwitz & Sagarin, Milford, Conn., for plaintiffs.

Herbert M. Wachtell, George T. Conway, III, Arthur S. Greenspan, Wachtell, Lipton, Rosen & Katz, New York City, Thomas J. Groark, Jr., Sharon S. Tisher, Day, Berry & Howard, Hartford, Conn., for defendants.

### RULING ON MOTION TO DISMISS SECOND AMENDED COMPLAINT

NEVAS, District Judge.

On December 2, 1991, the court dismissed all five counts of this uncertified

the court may take into account a wide range of material. 5A C. Wright and A. Miller, *Federal Practice and Procedure: Civil* § 1364, at 475–81 (1990 & 1992 Supp.) ("Wright & Miller"). In a number of recent decisions, the Second Circuit has addressed the breadth of material a district court may consider on a Rule 12(b)(6) motion to dismiss. In *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989), the court held that a district court may deem the complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. *See also Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir.1985). In *I. Meyer Pincus and Assoc., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir.1991), the court held that a district court may consider a prospectus upon which the plaintiff solely relies and is integral to the complaint, if the plaintiff neither attaches the prospectus to the complaint nor incorporates the prospectus by reference. Similarly, in *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991), the Second Circuit held that a district court reviewing the sufficiency of the allegations in a securities fraud action may review public disclosure documents required by law to be, and which actually have been, filed with the Securities Exchange Commission ("SEC"), especially if the plaintiff has been put on notice by the defendant's proffer of these documents. Finally, in *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992), the court held that a stock purchase agreement, offering memorandum and warrant, which the plaintiffs in a securities fraud action had in their possession or had knowledge of and upon which they relied in bringing suit, were properly considered by the district court in ruling on a motion to dismiss, even though the documents were not attached as exhibits to the complaint or incorporated by reference. *See also Field v. Trump*, 850 F.2d 938, 949 (2d Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989).

■ In light of this line of cases, the court, in considering the defendants' motion to dismiss, refers to Travelers' public filings and the full text of documents that are "integral to [the] plaintiff[s'] claims." *Id.* at 949; *Cortec,* 949 F.2d at 46–48. Furthermore, "[t]o the extent that the written document contradicts the allegations in the complaint, the former controls." *In re First Chicago Corp. Sec. Litig.,* 769 F.Supp. 1444, 1450 (N.D.Ill.1991), citing 5 Wright & Miller, § 1327 at 766–67. Of course, this reliance does not transform the Rule 12(b)(6) motion into a motion for summary judgment under Rule 56(c), Fed. R.Civ.P. *See Robbins v. Moore Medical Corp.,* 788 F.Supp. 179, 185 n. 3 (S.D.N.Y. 1992), citing *Cortec,* 949 F.2d at 47.

## B. Rule 9(b)

■ It is not arguable that Rule 10b–5 securities fraud claims must meet the requirements set forth by Rule 9(b), Fed. R.Civ.P. *See Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986); *Ross v. A.H. Robbins, Co.,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). Rule 9(b) provides, in relevant part: "In all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Accordingly, a party pleading fraud must specify the time, place, speaker and content of the alleged misrepresentation. *See Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 561 (2d Cir.1985). Additionally, Rule 9(b) must be read in conjunction with Rule 8(a)(2), Fed. R.Civ.P., which requires only that pleadings consist of "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ross,* 607 F.2d at 557 n. 20.

In harmonizing Rule 9(b) with Rule 8(a)(2), the court bears in mind the three purposes that underlie Rule 9(b)'s particularity requirement: "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect defendant against the institution of a strike suit." *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991), quoting *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1990). Moreover, although Rule 9(b) permits knowledge, or

scienter, to be pleaded generally, as the court observed in *Moore Medical:*

> [T]he Court of Appeals for this Circuit recently has taken a relatively stringent approach to Rule 9(b), with the Rule's acceptance of general pleadings as to scienter tempered by the requirement that the plaintiffs "plead the factual basis which gives rise to a 'strong inference' of fraudulent intent."

*Moore Medical,* 788 F.Supp. at 190, quoting *O'Brien,* 936 F.2d at 676. Thus, "while Rule 9(b) permits scienter to be demonstrated by inference, this 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" *O'Brien,* 936 F.2d at 676, quoting *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990).

## II. *The Amended Complaint*

In count one of the second consolidated amended complaint ("the amended complaint"), the plaintiffs allege that the defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1992). The plaintiffs sue the individual defendants in count two, alleging violations of Section 20(a) of the 1934 Act. In count three, the plaintiffs contend that the defendants violated Sections 11, 12(2) and 15 of the Securities Act of 1933 ("the 1933 Act"), 15 U.S.C. §§ 77k, 77*l*, 77*o*. Counts four and five are grounded in state common law and are brought against all defendants.

In August 1988, Travelers, one of the largest insurance companies in the United States, announced a substantial loss for the second quarter, primarily due to the addition of $415,000,000 to its real estate operations loss reserves. (Am.Compl. ¶¶ 22, 24). As a consequence, its net income for 1988 fell to $55,000,000, from $321,000,000 for 1987. (Am.Compl. ¶ 25). During 1989, Travelers made no material changes in the valuation of its real estate assets and reported a net income of $445,000,000 for the year. (Am.Compl. ¶ 26).

The plaintiffs allege that throughout the Class Period—November 15, 1989 through October 5, 1990—Travelers portrayed its financial and operating condition, particularly with respect to its real estate related assets portfolios, in an unrealistically positive light. (Compl. ¶¶ 1, 28). Instead of publicly disclosing "significant and increasing problems" with its real estate assets, Travelers touted positive operating results and sound investment practices. (Compl. ¶ 28). Thus, the plaintiffs allege that Travelers, in its Third Quarter 1989 Form 10–Q, stated that it had adequately valued its real estate related assets. (Am.Compl. ¶ 29). In addition, the plaintiffs contend that the defendants made false and misleading statements in a variety of other contexts, including statements in the 1988, 1989 and 1990 Annual Reports, (Am.Compl. ¶¶ 30, 41, 48–50), statements made at the 1990 annual shareholders' meeting, (Am.Compl. ¶ 33), statements made in a variety of Form 10–Qs, (Am.Compl. ¶¶ 34–37, 46, 49), and statements made in filings with state insurance regulators (Am.Compl. ¶ 40). These statements allegedly constituted an "unrealistically optimistic and materially false and misleading" depiction concerning the condition of Travelers' real estate related asset portfolios, which culminated on October 5, 1990, when Travelers publicly announced that it expected to report a $500 million third quarter loss, and that it was cutting its quarterly dividend from $0.60 to $0.40. (Am.Compl. ¶ 51).

The heart of plaintiffs' allegations is contained in paragraph thirty nine of the amended complaint. There, the plaintiffs present data on individual mortgage loans that was disclosed in Travelers' publicly available state regulatory filings. The plaintiffs allege that mortgage loans in foreclosure increased from $618 million to $787 million to $866 million at the end of 1988, 1989 and 1990, respectively. Moreover, the plaintiffs allege that from year-end 1989 to year-end 1990, the aggregate balance of "troubled mortgages"—defined as loans in foreclosure plus loans not in foreclosure with payments three months overdue—increased from $750 million to $1,555 million, "or by 94%." (Am.Compl. ¶ 39). The plaintiffs conclude that:

> Travelers' public reports and filings failed to disclose this enormous growth in troubled properties and the failure to

disclose these facts rendered the statements that were made about the value and status of Travelers' real estate related asset portfolios, as alleged herein, materially false and misleading. (Am.Compl. ¶ 39).

The plaintiffs also allege that Shima, Budd and Thorsen, as members of Travelers' Investment Committee, approved or authorized each loan or investment and had supervisory authority over Travelers' lending and investment activities. (Am.Compl. ¶ 52). As members of the Investment Committee, the individual defendants reviewed reports on specific investments, the progress of investment portfolios and evaluated investment strategies. (Am.Compl. ¶ 52). The plaintiffs allege that Budd, Shima and Thorsen had knowledge or acted in reckless disregard of "the materially adverse facts that were not disclosed." (Am.Compl. ¶ 52). Thus, the individual defendants allegedly deceived the investing public by disseminating reports and statements that were materially false and misleading.

Moreover, the plaintiffs allege that the individual defendants had "considerable reason" for misrepresenting Travelers' financial condition. (Am.Compl. ¶ 54). Their motives included: (1) incentive-based compensation (Am.Compl. ¶ 55); (2) a "generous" retirement plan, under which benefits were based on an executives' "final average salary" (Am.Compl. ¶ 56); (3) the importance of maintaining capital surplus for insurance underwriting purposes (Am. Compl. ¶ 56); and (4) deterring corporate takeovers by implementing "poison pill" and "golden parachute" provisions, and, more generally, by falsely overstating the reported value of Travelers' assets and income. (Am.Compl. ¶ 57).

Finally, the court notes the sole, cryptic allegation in paragraph fifty nine of the amended complaint: "It has been publicly announced that the Securities and Exchange Commission is investigating Travelers' disclosure practices with respect to its real estate related assets."

Thus, the plaintiffs contend that the amended complaint "simply alleges a classic securities fraud action," (Pltf.s' Mem. Opp'n Mot. Dismiss at 4): during the Class Period "the defendants failed to disclose crucial facts about Travelers' deteriorating real estate related asset portfolios and the accounting therefor," (Am.Compl. ¶ 1), while the defendants' public statements "indicated that Travelers' exposure to an adverse real estate climate had already been taken into account by Travelers' management." (Am.Compl. ¶¶ 24–38). Or,

[p]ut differently, the Complaint alleges that Travelers' October 5, 1990 announcement that it was slashing its regular dividend and expected to report a $500 million loss for the quarter ended September 30, 1990, which announcement cause a precipitous drop in the price of Travelers' stock, constituted a belated acknowledgement of circumstances well known to the defendants before and during the Class Period.

(Pltf.s' Mem. Opp'n Mot. Dismiss at 5).

In support of these contentions, the plaintiffs allege what they term a "matrix of nine specific categories of material omissions and three specific material misstatements, each of which, standing by itself, would be sufficient to support a Rule 10b–5 claim." (Pltf.s' Mem. Opp'n Mot. Dismiss at 6).

Below, the court examines the sufficiency of each category of alleged material omissions and misstatements. The court concludes that the plaintiffs' allegations do not withstand analysis, whether taken in the aggregate or singularly. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir.1992) ("each [allegation should be] capable of evaluation under the legal principles [ ] set forth"); *Alfus v. Pyramid Technology Corp.*, 745 F.Supp. 1511, 1517 n. 4 (N.D.Cal.1990) ("[c]ourts in analogous cases ... routinely analyze complaints statement by statement to determine if any particular utterance can be considered false or misleading").

### III. *The Section 10(b) Claim*

Under the authority provided by Section 10(b) of the 1934 Act, the SEC promulgated Rule 10b–5, which makes it unlawful to misrepresent or omit material

information in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b–5 (1992). To state a cause of action under Section 10(b) and Rule 10b–5, the plaintiffs must allege that, "in connection with the purchase or sale of securities, the defendant[s], acting with scienter, made a false material representation or omitted to disclose material information and that the plaintiff[s'] reliance on the defendant[s'] actions caused [them] injury." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir. 1985). *See also Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988).

### A. Materiality

■ Under Section 10(b), information is "material" only if its disclosure would alter the "total mix" of facts available to an investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision." *Levinson,* 485 U.S. at 231–32, 108 S.Ct. at 983–84; *see also Milton v. Van Dorn Co.,* 961 F.2d 965, 969 (1st Cir.1992); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 540 F.2d 27, 33–34 (2d Cir.1976) (plaintiff must allege that misrepresentations were a "substantial factor" in or a "significant contributing cause" of an investment decision).

#### 1. *Material Omissions*

a. Allegations Based Upon a Comparison of State and Federal Filings

The plaintiffs make four allegations based upon comparisons of Travelers' state and federal filings. The court addresses each allegation below. However, as a preliminary matter, the court recognizes that state and federal securities filings differ, in part, because they are governed by different accounting principles. State filings are governed by precise, statutory standards established by state insurance commissioners. *See e.g.,* Conn.Gen.Stat. § 38a–53; Conn. Agencies Regs. § 38–4–1 *et seq.* Thus, for example, state filings contain schedules of individual loans, while federal filings do not. On the other hand, federal securities filings are governed by Generally Accepted Accounting Principles ("GAAP"),

> the basic postulates and broad principles of accounting pertaining to business enterprises, approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants. These principles establish guidelines for measuring, recording, and classifying the transaction of a business entity.

*S.E.C. v. Price Waterhouse,* 797 F.Supp. 1217, 1223 (S.D.N.Y.1992) (Sprizzo, J.). As the court noted in *Carteret Sav. Bank, FA v. Office of Thrift Supervision,* 762 F.Supp. 1159, 1163 n. 4 (D.N.J.1991), *vacated and remanded on other grounds,* 963 F.2d 567 (3d Cir.1992), "[v]arious methods of accounting may be consistent with GAAP, and in fact, different methods may be used for different purposes and still be consistent with GAAP."

#### (i) *Mortgage Loan Delinquencies: Growth in Troubled Properties*

■ Paragraph thirty nine of the amended complaint alleges that, during 1988, 1989 and 1990, Travelers did not disclose "the extent of mortgage loan delinquencies and that such delinquencies were increasing materially." (Am.Compl. ¶ 39). More specifically, the plaintiffs contend that Travelers made material omissions concerning increases in foreclosed loans and "troubled properties," a term defined as "long-term mortgages having payments overdue more than three months." (Am.Compl. ¶ 39). This allegation fails for two reasons.

First, an examination of Travelers' filings with the SEC and state regulatory authorities reveals that Travelers disclosed extensive information about the significant growth in troubled properties. Indeed, Travelers disclosed information concerning: (1) the amount of loans in the process of foreclosure, Def.s' App. Ex. B at 14 (1988 Annual Report); increases in the amount of foreclosed properties, Def.s' App. Ex. C at 18 (1988 Form 10–K); the amount of losses charged to reserves, Def.s' App. Ex. G at 46 (1989 Annual Report); increases in no-

nincome-producing loans, Def.s' App. Ex. H at 16 (1989 Form 10–K); and levels of restructured loans, Def.s' App. Ex. J at 22 (Second Quarter 1990 Form 10–Q). These disclosures contradict the allegations set forth in the amended complaint.

Second, although the plaintiffs contend that the disclosures set forth above are insufficient because the defendants failed to disclose the "amount of delinquencies," Pltf.s' Mem. Opp'n Mot. Dismiss at 8, the SEC does not require Travelers, an insurance company, to reveal the extent of its mortgage delinquencies in federal filings. *Cf.* 17 C.F.R. § 229.802(c) (1992). Moreover, Travelers actually did disclose these delinquency figures in its state filings, which are governed by standards set by the National Association of Insurance Commissioners and, thus, differ from SEC-mandated disclosures. *See* Aff. Robert I. Harwood, Exs. A and B (1988 and 1989 Annual Statements filed with Insurance Department of the State of Massachusetts).

Accordingly, a complete examination of Travelers' publicly filed documents fully supports the defendants' contention that they, in fact, fully disclosed foreclosure proceedings, mortgage restructurings, actual foreclosures, nonincome-producing loans and actual losses suffered on mortgage loans. As the court noted in *Alfus*, 745 F.Supp. at 1520, "defendants' provision of adverse information to the securities analysts negates an inference that the company acted with an intend to defraud." *See also Kramer*, 937 F.2d at 778 (in light of full disclosure by defendants "there is no hint of any intent to deceive"); *Crystal v. Foy*, 562 F.Supp. 422, 427 (S.D.N.Y.1983) ("the very document [plaintiff] relies upon negates the charge of fraud[ ]").

### (ii) *Appraisals*

In paragraph thirty eight of the amended complaint, the plaintiffs allege that Travelers had "current" property appraisals for only twenty seven percent of loans in its real estate related asset portfolios which were in the process of foreclosure. This "small percentage" of assets with current appraisals allegedly rendered false and misleading the federal disclosure statements Travelers made concerning its loan-monitoring efforts. (Am.Compl. ¶ 38).

Paragraph thirty eight is deficient primarily because the plaintiffs fail to allege facts that suggest the absence of current property appraisals undermined the accuracy of Travelers' federal disclosures about the value of its mortgages and real estate assets. Instead, the plaintiffs' allegations concerning the appraisal of Travelers' real estate related portfolio assumes that formal appraisals are necessary to the valuation of every loan. Moreover, the plaintiffs have not pleaded particularized facts alleging that Travelers failed to employ reasonable valuation methods.

Finally, the baseless nature of the allegations in paragraph thirty eight is highlighted by the plaintiffs' declaration that:

> [B]ased on information available to them through contacts with regulatory agencies, ... we are confident that discovery will disclose that many, if not all, of the appraisals actually performed were not performed by independent appraisers. Plaintiffs believe that such "appraisals" were actually performed in-house by Travelers' employees.

(Pltf.s' Mem. Opp'n Mot. Dismiss at 7 n. 4). *Cf.* Tr. Hr'g Mot. Dismiss (July 24, 1992) at 40 (in response to inquiry by court about nature of appraisals counsel for plaintiffs responded "we just don't know"). This argument represents exactly the type of conduct Rule 9(b) is designed to retard. *See Evanowski v. BankWorcester Corp.*, 788 F.Supp. 611, 615 (D.Mass.1991) (quotations omitted) (courts must be rigorous in demanding factual support in securities context to minimize chance "that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes that the process will reveal relevant evidence"); *Ciresi v. Citicorp*, 782 F.Supp. 819, 822 (S.D.N.Y.1991), *aff'd mem.*, 956 F.2d 1161 (2d Cir.1992) (mixing metaphors, Judge Owen noted "it would not be appropriate to allow this complaint to stand so that the plaintiff might conduct a fishing expedition to see if there is a smoking gun"). Of course, the court recognizes that allegations may be based on informa-

tion and belief when facts are peculiarly within the opposing parties knowledge. *Luce,* 802 F.2d at 54 n. 1. Still,

> that exception to Rule 9(b)'s general requirement of particularized pleading does not constitute a license to base claims of fraud on speculation or conclusory allegations. Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy a relaxed pleading standard.

*Ochs v. Shearson Lehman Hutton Inc.,* 768 F.Supp. 418, 419 (S.D.N.Y.1991) (citations omitted). The plaintiffs have not met this standard either.

### (iii) *Real Estate Exposure in "Other Investments"*

■ In paragraph forty of the amended complaint, the plaintiffs point to Schedule BA, Part 1, of Travelers' state insurance department filings, where Travelers disclosed the extent of real estate investments in a line-item entitled "other long-term invested assets." Under these schedules, Travelers listed as much as $258 million in real estate assets generating losses as high as $17 million per year. In contrast, the plaintiffs contend that the defendants "concealed" these real estate related losses in Travelers' federal disclosures. The plaintiffs allege that the defendants failed to disclose

> that a significant portion of Travelers' assets listed on its balance sheet as 'Other Investments' were actually real estate assets which, in the aggregate, produced substantial losses, despite the high aggregate book value.

(Am.Compl. ¶ 40). Put differently, the plaintiffs contend that while Travelers did reveal, in state filings, the extent of real estate related assets and losses under the caption "other investments," Travelers omitted the extent of these investments under the caption "other investments" in its federal filings.

The plaintiffs' allegations here are insufficient and disingenuous. First, Travelers in fact did disclose the allegedly omitted investments, which included real estate related investments such as real estate relat-

ed corporate joint ventures and partnerships. In Schedule I of Travelers' 1988 Form 10–K, the defendants disclosed that the caption "other investments" "[i]ncludes equity of $268 million in real estate joint ventures." (Def.s' App. Ex. C at 39 n. 3) (1988 Form 10–K). Likewise, Schedule I of Travelers' 1989 Form 10–K disclosed that the "other investments" category "[i]ncludes equity of $338 million in real estate joint ventures and $30 million of loans to real estate joint ventures accounted for by the equity method." (Def.s' App. Ex. H at 35 n. 3) (1989 Form 10–K). Thus, Travelers disclosed the very investments the plaintiffs allege were concealed.

Furthermore, in making such disclosures in the Form 10–Ks, Travelers revealed investments it was not even required to report. SEC Regulation S–X, which dictates the form of financial statements for federal reporting purposes, requires insurance companies to:

> [s]tate separately in a note the amount of any class of investments included in ["other long-term investments"] if such amount exceeds ten percent of stockholders' equity.

17 C.F.R. § 210.7–03(a), note 5 (1992) ("Section 210.7–03(a)"). It appears that during the Class Period, Travelers' level of assets in "other investments" simply never reached the statutory threshold annunciated in Section 210.7–03(a). Throughout the Class Period, Travelers' net investment income averaged approximately $3.5 billion per year, while its total invested assets amounted to more than $43 billion per year, and shareholder equity exceeded $4.2 billion. (Def.s' App. Ex. B at 26–27 (1988 Annual Report); Def.s' Ex. G at 30–31 (1989 Annual Report); Def.s' Ex. L at 34–35 (1990 Annual Report)). Thus, Travelers' joint-venture real estate related investments—$231 million in 1988, $258 million in 1989 and $228 million in 1990—amounted to less than one percent of its invested assets throughout the Class Period, and constituted well under ten percent of stockholders' equity. (Def.s' App. Ex. F. at 4 (Third Quarter 1989 10–Q); Ex. K at 4 (Third Quarter 1990 10–Q)). For these reasons,

paragraph forty is fails to plead facts raising any inference of securities fraud under Rule 10b–5.

#### (iv) *Low-yielding Investment Real Estate*

■ Based on state filings, in paragraph forty four of the amended complaint the plaintiffs allege that the rate of return Travelers received on foreclosed properties ranged between an "anemic" 3.5 percent to a "minuscule" 2.5 percent. These yields, the plaintiffs contend, indicate that foreclosed properties were "carried," or valued, at an "unrealistic" 28.6 times their income on December 31, 1988 and a "fantastic" forty times their income and 36 times their income on December 31, 1989 and 1990, respectively. Thus the properties were "grossly overvalued." (Am.Compl. ¶ 44). In response, the defendants argue that the low rates do not support the allegation that Travelers' assets were materially overstated. The court agrees with the defendants.

The allegations in paragraph forty four are based on the assumption that real estate must be valued at a multiple of current income, irrespective of its future condition. This assumption is not valid. For example, a commercial property might be sold, or the income flow from the property may fluctuate as a function of vacancy rates or national economic health. Moreover, some real estate simply generates no income. Thus, the allegations in paragraph forty four do not support the claim of improper valuation.

Furthermore, the different accounting standards used in state and federal filings explain why Travelers' low-yielding investment real estate was not overvalued. While the property values disclosed in state filings, which are prepared under statutory accounting principles, do not take into account investment valuation reserves, the property values provided in the federal filings comply with GAAP, which does require investment valuation reserves to be taken into account. *Cf. Delta Holdings v. National Distillers*, 945 F.2d 1226, 1229 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1671, 118 L.Ed.2d 390 (1992) (GAAP "neither specifies a precise actuarial method nor requires that the reinsurer retain an independent actuary to prepare of review loss reserve estimates"). Accordingly, the allegations concerning low-yielding investment real estate are deficient.

#### b. Allegations Concerning "Risky" and Speculative Loans

In paragraphs forty one, forty five and forty nine, the plaintiffs make allegations that generally address the relative risk of portions of Travelers' mortgage portfolios. The court addresses each allegation below.

#### (i) *Second Mortgages*

■ The plaintiffs allege, in paragraph forty one of the amended complaint, that Travelers failed to disclose "that it was holding $585 million in second mortgages on commercial properties." (Am.Compl. ¶ 41). The plaintiffs allege that these second mortgages constituted a "substantial amount of Travelers' mortgages."

Standing alone, Travelers' failure to disclose the extent of second mortgages does not constitute a material omission. Travelers disclosed that it was holding $528 million in second mortgages for the first time in its 1990 Annual Report. Yet, these second mortgages were part of a total mortgage-loan and real estate portfolio of $16.129 billion. Moreover, Travelers reported a total investment portfolio of $43.237 billion and a total asset portfolio of $55.356 billion. (Def.s' Ex. L at 37 (1990 Annual Report)). Thus, Travelers' second mortgages constituted approximately one percent of its assets and three percent of its mortgage-loan and real estate portfolio. In view of the entirety of information disclosed by Travelers, the plaintiffs have failed to allege particularized facts from which the court can infer that the failure to disclose $585 million in second mortgages was a material omission of fact.

Moreover, while the plaintiffs note that in its 1991 Annual Report Travelers finally explicitly disclosed the "increased risk" inherent in second mortgage loans, the Report appears to support the contrary position—that Travelers was protecting itself from the risks of heavy debt loads on prop-

erties by increasing the interest rates it charged for second mortgage loans:

> At December 31, 1991, Travelers had second mortgage loans on commercial properties of approximately $205 million. Third-party first mortgage loans on these properties are estimated to be $152 million. Travelers' subordinated position in these loans increases risk *for which Travelers is compensated through the interest rate charged for the second mortgage loan.*

(Aff. Robert Harwood, Ex. C at 39 (emphasis supplied) (1991 Annual Report)).

### (ii) *Certain Speculative Loans*

 Paragraph forty five of the amended complaint concerns Travelers' alleged failure "to disclose the speculative nature of part of Travelers' mortgage portfolio," and that "[t]he speculative nature of Travelers['] loan portfolio and the resulting loss of income made a cut in Travelers['] dividend inevitable." (Am.Compl. ¶ 45). The plaintiffs animate these allegations with an example of an office building in Philadelphia for which Travelers provided a mortgage loan. The also contend that a "portion of Travelers' mortgage loan portfolio was structured so that payment of interest rates was dependent upon escalating rents." (Am.Compl. ¶ 45).

Paragraph forty five fails for the same reason the allegations failed in the original complaint: The plaintiffs have failed to specify "what loans, at what times, and in what amounts were 'risky,'" *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978), and that "particular loan[s] should have been treated in a different way." *Driscoll v. Landmark Bank for Sav.*, 758 F.Supp. 48, 53 (D.Mass.1991). Indeed, even concerning the Philadelphia office building, the plaintiffs have not specified the amount of the loan, what reserve Travelers should have taken, whether the original interest rate was inappropriate, whether the loan resulted in the loss of principal, or whether the loan was insufficiently collateralized.

 Likewise insufficiently specific is the plaintiffs' allegation that Travelers structured "[a] portion" of its mortgage loan portfolio in a way that the payment of interest rates was contingent upon escalating rents. The plaintiffs fail to allege what portion of Travelers' mortgage loan portfolio was so-structured, and whether it was riskier to link interest rates to escalating rents than to employ fixed-rate mortgages.

Similarly, in *First Chicago*, 769 F.Supp. at 1454, the court evaluated plaintiff shareholders' securities fraud allegation that the defendant, a bank with a $4.472 billion real estate loan portfolio, "had initiated a substantial real estate loan in excess of $200 million" to a particular borrower "'without adequate collateral, guarantees, or assurances that it could be syndicated.'" The court observed:

> Although this allegation comes close to satisfying 9(b)'s particularity requirement by specifying a particular speculative and risky transaction, and listing—albeit in a conclusory manner—the facts on which the belief that the transaction was problematic is founded, it alone cannot support plaintiffs' much broader allegations of false and misleading statements and omissions regarding the quality of First Chicago's loan portfolios, its conservative lending policies and rigorous credit management, and its confidence that it would achieve its financial goals. The total value of the [ ] loan, plaintiffs allege in their complaint, was some figure "in excess of $200 million." Even assuming a figure as large as $250 million, which allows a 25% surplus to account for the "in excess" language, that loan is dwarfed by the immense size of First Chicago's real estate loans portfolio ($4.472 billion at the end of 1989[ ]) and even more by First Chicago's total commercial loan exposure ($20.561 billion at the end of 1989[ ].

*Id.* (citations omitted). *See also In re First Chicago Corp. Sec. Litig.*, 789 F.Supp. 919, 923–24 (N.D.Ill.1992) (allegations in amended complaint failed because plaintiffs did not allege that loan in question was put into jeopardy due to "inadequate collateral, delinquent payments or by a plea from [borrower] to renegotiate its debt with [de-

fendant]"). For the same reasons, the plaintiffs' allegations fail.

### (iii) *Current Value of Restructured Loans*

In paragraph forty three of the amended complaint the plaintiffs allege that "defendants failed to disclose the current value of Travelers' $1.7 billion of restructured mortgage loans, which disclosure was necessary in order to present fairly Travelers' financial condition." (Am. Compl. ¶ 43). This bald assertion is deficient in view of the plaintiffs' failure to allege any particularized facts from which the court may infer fraud. Moreover, as the plaintiffs recognize, Pltf.s' Mem. Opp'n Mot. Dismiss at 6 n. 3, the defendants properly adhered to GAAP when they used historical cost accounting, rather than market value accounting, in reporting current mortgage loan values.

### c. "Phantom" Interest

Paragraph forty two of the amended complaint alleges that:

During a portion of the Class Period, defendants improperly recognized phantom (i.e., accrued but unpaid) interest on Travelers' portfolio of approximately $1.7 billion of "restructured" mortgage loans (i.e., loans with respect to which payment or other terms have been modified in favor of the mortgagor as a result of the mortgagor's inability to comply with the original loan terms) thereby materially inflating Travelers' reported income. Under relevant accounting principles it was improper to recognize and report such "income."

(Am.Compl. ¶ 42). The plaintiffs characterize this alleged method of artificially inflating income as "egregious" and "particularly pernicious." (Pltf.s' Mem. Opp'n Mot. Dismiss at 11). In spite of the invective, the allegations in paragraph forty two are deficient.

The allegations are insufficient because the plaintiffs have failed to allege any particularized facts that either contradict Travelers' disclosures or support the contention that Travelers accrued interest in

violation of GAAP. *See Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 100 (3d Cir.1983) (complaint defective due to "complete absence of any disclosure of the manner in which, in establishing reserves for bad debts in the financial statements relied upon, the defendants knowingly departed from reasonable accounting practices"). For example, the plaintiffs have not alleged the amount of interest improperly recognized, the amount of artificially inflated income, a specification of relevant accounting periods, whether all accrued interest on all of the restructured loans was reflected in Travelers' financial statements, or only part of the accrued interest on some of the restructured loans was improperly recognized. Indeed, while the plaintiffs contend that Travelers violated "relevant accounting principles," they have failed to cite any such principle. Moreover, Travelers' disclosures indicate that it added to the interest portion of its real estate reserves throughout the Class Period and accrued some, but not all, of its unpaid mortgage loan interest. *See* Def.s' Ex. G at 46–47 (1989 Annual Report); Def.s' Ex. L. at 51–52 (1990 Annual Report).

Moreover, although the allegations in paragraph forty two ostensibly concern "phantom interest," ultimately they involve the adequacy of Travelers' mortgage loan loss reserves. As loan loss allegations, they are defective due to the plaintiffs' failure to (1) allege that "particular loan[s] should have been treated in a different way," *Driscoll*, 758 F.Supp. at 53; (2) "specif[y] [ ] what loans, at what times, and in what amounts were 'risky,'" *Denny*, 576 F.2d at 469; and (3) identify which restructured mortgage loans in Travelers' portfolio were manipulated in order to produce "improperly recognized phantom interest." (Am.Compl. ¶ 42). *See generally Ferber I*, 785 F.Supp. at 1109–10; *Steiner v. Shawmut Nat'l Corp.*, 766 F.Supp. 1236, 1244–47 (D.Conn.1991).

Finally, the plaintiffs argue that "it is impossible for [them] to specify the particular restructured loans involved in the absence of discovery." (Pltf.s' Mem.

Opp'n Mot. Dismiss at 11). As the court noted in *Evanowski*, 788 F.Supp. at 615 (quotations omitted), Rule 9(b) is designed to thwart parties who "bring a suit and conduct extensive discovery in the hopes that the process will reveal relevant evidence."

Accordingly, paragraph forty two of the amended complaint lacks the specificity to satisfy Rule 9(b) and thereby fails to state a Rule 10b–5 securities fraud claim.

(d) Management's Discussion and Analysis

■ The last category of material omissions alleged by the plaintiffs is set forth in paragraph forty six of the amended complaint. There, the plaintiffs contend that Travelers failed to comply with Item 303 of Regulation S–K, 17 C.F.R. § 229.303 (1992). Regulation S–K addresses what plaintiffs term "the centerpiece of the SEC's disclosure framework for a public company." (Am.Compl. ¶ 46). Under Item 303, which is entitled "Management's discussion and analysis of financial condition and results of operations" ("MD & A"), public corporations must discuss three categories of information in annual filings: (1) liquidity; (2) capital resources; and (3) results of operations. Citing Travelers' Third Quarter 1989 10–Q, and First and Second Quarter 1990 10–Qs, the plaintiffs allege that the defendants violated Rule 10b–5 by failing to adequately identify and describe the "negative trends permeating Travelers' real estate related asset portfolios." More specifically, the defendants allegedly did not disclose "the materially increasing mortgage delinquencies and increasing properties in foreclosure, as well as the declining yields associated" with the real estate related asset portfolios. (Am.Compl. ¶ 46).

The court has carefully examined the entirety of defendants' MD & A disclosures. Contrary to the plaintiffs' selective quotations of Travelers' public filings throughout the amended complaint, a review of Travelers' disclosures reveals that Travelers, in fact, did disclose "known trends" and "uncertainties." Thus, Travelers discussed the uncertainties in the national and regional real estate markets, Def.s' App. Ex. G. at 29 (1989 Annual Report); Def.s' App. Ex. I at 17 (First Quar-

ter 1990 10–Q); Def.s' App. Ex. J at 8 and 22 (Second Quarter 1990 10–Q); decreases in net investment income due to mortgage restructurings, Def.s' App. Ex. B at 21 (1988 Annual Report); changes in reserve valuation and levels, Def.s' App. Ex. D at 11 (First Quarter 1989 10–Q); Def.s' App. Ex. E. at 12 (Second Quarter 1989 10–Q); Def.s' App. Ex. F at 12 (Third Quarter 1989 10–Q); and growth in nonincome-producing loans, troubled mortgage loans, foreclosed properties and foreclosure proceedings, Def.s' App. Ex. B at 21 (1988 Annual Report); Def.s' App. Ex. F at 14 (Third Quarter 1989 10–Q); Def.s' App. Ex. E at 14 (Second Quarter 1989 10–Q).

In view of the foregoing, the court concludes that Travelers' MD & A statements adequately disclosed "uncertainties" and "known trends." And, beyond the adequacy of the disclosures, Travelers' MD & A statements "besp[oke] caution on the part of investors and make the required showing of fraud all the more unlikely." *Moore Medical*, 788 F.Supp. at 184 (quotation omitted); *see also Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1040 (6th Cir. 1991) ( "[e]conomic projections are not actionable [under Rule 10b–5] if they bespeak caution"); *Pincus*, 936 F.2d at 763 ("[t]he statements contained within the prospectus clearly 'bespeak caution,' rather than encouraging optimism"); *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 227 (S.D.N.Y.1989) ("plaintiffs have failed to articulate how the reports and projections by [the defendants] were false and misleading given the cautionary language contained in the material"); *In re Bell Atlantic Corp. Sec. Litig.*, No. 91–0514, 1991 WL 234236, at *6 (E.D.Pa. Oct. 30, 1991) (McGlynn, J.) ("[t]he accuracy of the overall presentation dwarfs the allegedly misleading nature of [the defendant's] other prediction"). Accordingly, the plaintiffs' allegations contained in paragraph forty six of the amended complaint fail as a matter of law.

### 2. *Misstatements*

#### a. "Real Estate Asset Portfolio Improves"

In the "Review of Operation" section of Travelers' 1989 Annual Report, a bold-face

headnote appears, stating: "Real estate asset portfolio improves." In paragraph forty eight of the amended complaint, the plaintiffs contend that this headnote constitutes a material misrepresentation "in view of the increasing mortgage delinquencies, increasing foreclosures, and declining income from foreclose property" described elsewhere in the amended complaint. (Am. Compl. ¶ 48).

In view of the textual discussion that followed the headnote in the 1989 Annual Report, as well as the data concerning Travelers' mortgages and real estate related portfolio in the 1989 Annual Report, Def.s' App. Ex. C at 18 (1989 Annual Report), 1989 Form 10–K, Def.s' App. Ex. H at 16 (1989 Form 10–K), and Second Quarter 1990 Form 10–Q, Def.s' App. J. at 22 (Second Quarter 1990 Form 10–Q), the plaintiffs have failed to properly allege that the defendants made a material misstatement in the 1989 Annual Report. As the court noted in *Bell Atlantic*, 1991 WL 234236, at *6, 1991 U.S. Dist. LEXIS 15874, at *22, "[t]he accuracy of the overall presentation dwarfs the allegedly misleading nature of [the defendant's] other" statements.

### b. Loan Coverage Ratio

In the absence of any particularized facts in support of the allegations contained in paragraph forty nine of the amended complaint, the plaintiffs have failed to adequately allege that the defendants violated Rule 10b–5 by making materially false and misleading statements.

### c. Borrower Concentration and the Vantage Loans

Shareholders' equity in Travelers during 1988 and 1989 was $4.6 billion and $4.8 billion, respectively. In Travelers' 1988 and 1989 Annual Reports, the defendants stated that "Travelers had no concentration of investments in a single investee exceeding 10% of consolidated shareholders' equity." The plaintiffs allege that these statements constituted material misstatements because "Travelers loaned the Vantage Companies, of Dallas, Texas, an aggregate of $625 million." (Am.Compl. ¶ 50). The defendants contend that this allegation is "grossly misleading." (Mem.Supp.Mot. Dismiss at 30).

The allegations in paragraph fifty fail for several reasons. Foremost, the plaintiffs provide no factual basis for their allegations. Instead, they allege flatly that, at an unspecified time, Travelers made the loans to the Vantage Companies. Yet, this allegation is perfectly consistent with Travelers' disclosures in the 1987, 1988 and 1989 Annual Reports. In the 1987 Annual Report, Travelers disclosed that it had $625 million in outstanding investments. The corresponding disclosures in 1988 and 1989 reveal that Travelers no longer had a concentration of investments in a single investee exceeding ten percent of shareholders' equity. (Def.s' App. Ex. B at 43 (1988 Annual Report); Def.s' App. Ex. G at 46 (1989 Annual Report)). In addition, the allegations in paragraph fifty provide no factual basis for the suggestion that Travelers in fact failed to reduce the amount of its investments with Vantage so that the concentration of investments in a single investee no longer exceeded ten percent of shareholders' equity. Accordingly, there is neither a logical nor factual basis from which a strong inference of fraud may be inferred.

### B. Scienter

As noted earlier, to properly state a claim under Section 10(b), the plaintiffs also must allege that the defendants acted with scienter. In *Arthur Lipper Corp. v. S.E.C.*, 547 F.2d 171, 181 (2d Cir. 1976), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978), the Second Circuit defined scienter in the securities context as the "intent to deceive, manipulate or defraud." *Accord In re Software Toolworks, Inc. Sec. Litig.*, 789 F.Supp. 1489, 1498 (N.D.Cal.1992) (defining scienter as "a mental state embracing intent to deceive, manipulate, or defraud"). Although Rule 9(b) permits "conditions of mind" to be alleged generally, plaintiffs must allege at least circumstances that provide a "minimal factual basis" for the allegations of scienter. *Connecticut Nat'l Bank v. Fluor*, 808 F.2d 957, 962 (2d Cir.1987). In-

deed, these allegations "must give rise to a 'strong inference' that the defendants possessed the requisite fraudulent intent." *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). *See also Ouaknine v. MacFarlane*, 897 F.2d 75, 79–80 (2d Cir. 1990).

In order to plead scienter adequately, the plaintiff may allege actual intent to deceive, manipulate or defraud, or conduct amounting to reckless disregard for the truth of the representation. *See Healey v. Chelsea Resources, Ltd.*, 947 F.2d 611, 618 (2d Cir.1991). Recklessness occurs when the defendant actually knows or is aware of the danger that the plaintiff will be mislead. *See Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977). As the court noted in *S.E.C. v. Electronics Warehouse, Inc.*, 689 F.Supp. 53, 60 (D.Conn. 1988), *aff'd*, 891 F.2d 457 (2d Cir.1989), *cert. denied*, 496 U.S. 942, 110 S.Ct. 3228, 110 L.Ed.2d 674 (1990) (citation omitted), "[r]ecklessness has been defined as 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care,' " and which "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *O'Connor v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893, 899 (10th Cir.1992) (citations omitted). Of course, negligent conduct, whether gross, grave or inexcusable, does not suffice under Section 10(b). *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194–214, 96 S.Ct. 1375, 1382–91, 47 L.Ed.2d 668 (1976).

Although motive is not required to plead scienter, motive can be a means to establish scienter. *Beck*, 820 F.2d at 50. On the other hand, should the plaintiffs not allege facts which show a defendant had a motive for committing fraud,

> so long as plaintiff adequately identifies circumstances indicting 'conscious behavior' by the defendant from which an intent to defraud may fairly be inferred.

However, where a particular defendant's motive to defraud is not apparent, the strength of the circumstantial allegations must be correspondingly greater.

*Ochs*, 768 F.Supp. at 427.

### 1. *Fraudulent Intent or Reckless Behavior*

The plaintiffs contend that four paragraphs in the amended complaint constitute allegations of scienter that are supported by facts that give rise to a strong inference of fraudulent intent or recklessness. (Am. Compl. ¶¶ 52, 55–58). The fraudulent intent or recklessness of the individual defendants allegedly may be inferred from (1) their membership on the Investment Committee (Am. Compl. ¶ 52); (2) incentive-based compensation (Am.Compl. ¶ 55); (3) a "generous" retirement plan (Am.Compl. ¶ 56); and (4) and corporate takeover defenses implemented by Travelers. (Am. Compl. ¶¶ 56–58). Finally, in paragraph fifty nine, the plaintiffs allege that the SEC is "investigating Travelers' disclosure practices with respect to its real estate related assets." (Am.Compl. ¶ 59). The court agrees with the defendants that these allegations are not legally sufficient.

First, concerning incentive-based compensation and the "generous" retirement plan, the court examined and rejected this very argument in *Ferber I. See Ferber I*, 785 F.Supp. at 1107 ("[i]t does not logically follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent"). Moreover, the court finds unpersuasive case law in which courts have found scienter properly plead based on allegations concerning the opportunity for personal monetary gain and other forms of individual profit. *See e.g., In re 3Com Sec. Litig.*, 761 F.Supp. 1411, 1417 (N.D.Cal. 1990) (individual corporate officers allegedly personally profited by selling nearly two million of their stock holdings at artificially inflated prices); *McCoy v. Goldberg*, 748 F.Supp. 146, 151 (S.D.N.Y.1990) (investment advisors allegedly intended to defraud investors solely to generate for them-

selves substantial undisclosed commissions, gifts and loans).

Indeed, this action is similar to *In re First Chicago*. There, the court found that the plaintiffs failed to allege scienter adequately, where they alleged that the defendant corporate directors "had a financial incentive to inflate the value of those [stock] holdings and to preserve their substantial compensation from employment." *In re First Chicago*, 769 F.Supp. at 1455. The court concluded:

> But plaintiffs do not allege that the defendants sold any of their shares before the prices dropped, and certainly their jobs with the corporation are jeopardized more by failure to abide by First Chicago procedures (extending an unduly risky loan and not writing it off soon enough) than by a smaller real estate loan portfolio or depressed earnings earlier rather than later.

*Id.*

Second, the court rejects the plaintiffs contention that scienter can be inferred from the individual defendants' status as members of the Investment Committee. Membership on a committee that examines the propriety of loans or investments alone cannot possibly constitute "circumstances indicating 'conscious behavior' by the defendant from which an intent to defraud may fairly be inferred." *Ochs*, 768 F.Supp. at 427. Were the court to find such allegations sufficient, investment committee members of all corporations would, *per se*, act with scienter. Nevertheless, the court recognizes that some courts have deemed proper allegations of scienter predicated on individual defendants' status as "senior officer, directors and/or controlling shareholders [of defendant corporation] ... when taken together with [ ] more specific allegations linking their positions to their knowledge." *Ballan v. Wilfred Amer. Educ. Corp.*, 720 F.Supp. 241, 253 (E.D.N.Y.1989). Here, the plaintiffs have not made "more specific allegations linking their positions to their knowledge."

Finally, the individual "defendants' provision of adverse information to [the public by way of disclosures] negates an inference that [they] acted with an intend to defraud." *Alfus*, 745 F.Supp. at 1520. *Supra*, at 711.

### a. The SEC "Investigation"

The court also notes the emptiness of paragraph fifty nine of the amended complaint, in which the plaintiffs simply state that the SEC is conducting an "investigation" of Travelers' disclosure practices concerning real estate related assets. In the absence of any additional, particularized facts, the allegation raises neither an inference of fraud nor a strong inference of fraud. (Tr. Hrg' Mot. Dismiss at 71 (in response to the court's inquiry about the status of the SEC investigation, counsel for plaintiffs stated "I don't know where the investigation stands. The SEC generally is pretty closed mouthed about information of this type. I wish I had more information")).

Accordingly, the plaintiffs have failed to plead scienter either by motive or by "identifying circumstances indicating conscious behavior." *Beck*, 820 F.2d at 50. Otherwise, to sustain the amended complaint's allegations of scienter would undermine Rule 9(b)'s purpose of "safeguard[ing] defendant's reputation from 'improvident charges of wrongdoing.' " *Moore Medical*, 788 F.Supp. at 190 (citation and quotation omitted).

Of course, the court recognizes that "each 9(b) case necessarily rests on its particular facts." *Denny*, 576 F.2d at 470. Here, the amended complaint fails to adequately allege material omissions and misstatements, and fails to plead specific facts to support the strong inference of fraudulent intent on the part of the individual defendants.

### C. Reliance

A small portion of the hearing on this motion was devoted to the issue of whether the amended complaint adequately alleges reliance, an essential element of any Rule 10b–5 action. The defendants contend that the plaintiffs inadequately advance the fraud-on-the-market theory described by the Supreme Court in *Basic*, 485 U.S. at 241–2, 249. Since the plaintiffs have not

established materiality and scienter, the court does not determine whether the plaintiffs properly allege reliance on the alleged misrepresentations and omissions.

### D. The General "Theory" of the Amended Complaint

A large portion of the hearing on this matter, and a considerable number of pages in the memoranda submitted by both parties, were devoted to the issue of whether the amended complaint constitutes a "loan-loss reserve case." The defendants contend that the complaint is a loan-loss case in disguise, (Def.s' Mem.Supp.Mot. Dismiss at 1–2; Def.s' Reply Mem. Support Mot. Dismiss at 2), and that the plaintiffs have gone to "disingenuous ... almost comical" lengths to "pretend that this case does not involve Travelers' " reserve levels. (Tr. Hr'g at 6). In contrast, the plaintiffs contend that they have properly alleged securities law violations "without relying on the issue of Travelers' inadequate reserves." (Pltf.s' Mem. Oppn' Mot. Dismiss at 5).

In stark contrast with the original complaint, the amended complaint is devoid of the word "reserves" in the context of the plaintiffs' challenges to the accuracy of Travelers' disclosures. Thus, for example, in the original complaint, the plaintiffs pointed to October 5, 1990 as the day on which Travelers publicly announced that it expected to report a $500 million third quarter loss in earnings largely attributable to "a $650 million addition to reserves for possible losses on its real estate related investments and, as a result, it was cutting its quarterly dividend to $0.40 and $0.60." (Compl. ¶ 55). Now, in the amended complaint, the plaintiffs omit reference to the $650 million addition to reserves and, instead, limit the allegation to the "shock[ing]" October 5, 1990 announcement in which "Travelers suddenly announced that it expected to report a $500 million loss for the third quarter of 1990 and that it was slashing its quarterly dividend from $0.60 to $0.40." (Am.Compl. ¶ 51).

Yet, at the hearing on this motion, counsel for the plaintiffs remarked, "[T]his case is about loan loss reserves but not for the reason that [counsel for the defendants] thinks it is." (Tr. Hr'g Mot. Dismiss at 37). Instead of repeating their original allegations that the defendants "knowingly or reckless failed to increase its reserves for loan losses in the fact of increasingly difficult conditions in the real estate market," Compl. ¶ 54, the plaintiffs now allege that the defendants "failed to disclose crucial facts about Travelers' deteriorating real estate related asset portfolios," Am.Compl. ¶ 1, primarily by "materially overstat[ing] the value of" those portfolios. Am.Compl. ¶ 23. However, as the plaintiffs note, the "value of real estate related assets" consists of the costs of those assets minus reserves. (Pltf.s' Mem. Opp'n Mot. Dismiss at 6 n. 3). Thus, implicitly, the amended complaint is, indeed, about Travelers' loan loss reserves. It also bears noting that, in seeking leave to amend the original, dismissed complaint, the plaintiffs twice assured the court that, should leave be granted, they would:

> set forth many details (over and above what is already alleged) concerning numerous additional deeply troubled Travelers loans that would further substantiate plaintiffs' claim that Travelers knew or recklessly disregarded the fact that its loan loss reserves were inadequate during the Class Period.

(Pltf.s' Mem.Supp.Mot. Leave Amend at 7; Pltf.s' Reply Mem.Supp.Mot. Leave Amend at 5).

By evaluating each allegation of the amended complaint, the court has heeded the Second Circuit's observation in *Denny*, 576 F.2d at 470, that "each 9(b) case necessarily rests on its particular facts," and has concluded that the amended complaint is insufficient. Nevertheless, in the alternative, in viewing this suit as a loan-loss action, the court also concludes that the plaintiffs have breached the promise they made in the course of seeking leave to amend the original complaint. They have not "set forth many details (over and above what is already alleged) concerning numerous additional deeply troubled Travelers

loans." Indeed, they have failed to specify "what loans, at what times, and in what amounts were 'risky,'" *Denny,* 576 F.2d at 469, and have not adequately alleged that "particular loan[s] should have been treated in a different way." *Driscoll,* 758 F.Supp. 48, 53 (D.Mass.1991). *See also The Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411 (7th Cir.1992) (while the plaintiffs alleged that defendant " 'failed to establish adequate reserves[',] . . . nowhere [did the plaintiff] allege what the company's reserves were or suggest how great the reserves should have been").

The court does not go as far as the First Circuit did recently when it labeled a securities fraud complaint "a case of the meretricious posing as the meritorious." *Capri Optics Profit Sharing v. Digital Equip. Corp.,* 950 F.2d 5, 13 (1st Cir.1991). However, in view of the foregoing analysis, the court concludes that the "matrix" of nine categories of material omissions and three misstatements set forth in the amended complaint lack the specificity required by Rule 9(b), and, thus, the plaintiffs have failed to state a cause of action under Rule 10b–5.

IV. *Counts Two through Five*

Counts two, three, four and five are dismissed absent opposition. *See* Pltf.s' Mem. Opp'n Mot. Dismiss at 4 n. 2 ("as defendants' attack on Count I is inadequate, there is no reason to burden this Court with a discussion of Counts II through V").

*Conclusion*

Accordingly, the amended complaint is dismissed. The court recognizes that the usual practice upon granting a motion to dismiss is to allow leave to replead. *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198. (2d Cir.1990); *Pross v. Katz,* 784 F.2d 455, 459–60 (2d Cir.1986). However, in view of the deficiencies contained in both the original and amendment complaints, here the dismissal is with prejudice. *See Luce,* 802 F.2d at 57; *Ciresi,* 782 F.Supp. at 823–24. As the court observed in *Cortec,* 949 F.2d at 50, citing *Leonelli v. Pennwalt Corp.,* 887 F.2d 1195, 1198–99 (2d Cir.1989), "Obviously, where a defect in the complaint cannot be cured by amendment, it would be futile to grant leave to amend." Accordingly, the Clerk of the Court is directed to enter judgment in favor of each of the defendants.

SO ORDERED.