In re **HUNTER ENVIRONMENTAL SERVICES, INC. SECURITIES LITIGATION.**

**Norman and Doris F. LEVIN, et al., Plaintiffs,**

v.

**HUNTER ENVIRONMENTAL SERVICES, et al., Defendants.**

**No. 3:93cv031 (DJS).**

United States District Court, D. Connecticut.

March 29, 1996.

J. Daniel Sagarin, Elias A. Alexiades, Hurwitz & Sagarin, Milford, CT, Joshua H. Vinik, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Robert P. Frutkin, Savett, Frutkin, Podell & Ryan, Philadelphia, PA, Jonathan M. Plasse, Goodkind, Labaton, Rudoff & Sucharow, New York City, for plaintiff.

John S. McGeeney, Harold Nelson Eddy, Jr., Douglas C. Conroy, Paul, Hastings, Janofsky & Walker, Stamford, CT, Michael J. McHugh, Rich, May, Bilodeau & Flaherty, Boston, MA, for defendants.

## *MEMORANDUM OPINION AND ORDER*

SQUATRITO, District Judge.

### I. INTRODUCTION

Plaintiffs originally filed this putative class action on January 8, 1993, alleging violations of sections 10(b) and 20 of the Securities and Exchange Act of 1934 ("the Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission ("SEC"). 17 C.F.R. 240.10b–5. They allege that Defendant Hunter Environmental Services, Inc. ("Hunter"), failed to make material disclosures and made material misstatements, thus inducing investments through fraudulent actions in violation of § 10(b) of the Act. In addition, plaintiffs aver that certain individual defendants were controlling persons at the time of Hunter's fraudulent activity and thus are individually liable for the company's fraud under § 20 of the Act.[1] The complaint also alleges claims against the individual defendants for insider trading under § 20A of the Act, 15 U.S.C. § 78t–1, as added by § 5 of the Insider Trading & Securities Fraud Enforcement Act of 1988, Pub.L. No. 100–704, 102 Stat. 4680, and asserts a common law action for unjust enrichment based on the same alleged conduct.[2]

The case is now before the court on the defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated below, the motion will be granted.

### II. STANDARD

A court will dismiss a complaint only if it is clear that the plaintiffs cannot prove any set of facts in support of the claim that would entitle them to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *see also Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). The court accepts as true all well-pleaded factual allegations and views them in the light most favorable to the nonmoving party.

Although a court is primarily focused on the allegations within the complaint in passing upon a Rule 12(b)(6) motion, in a securities fraud action the court also may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, and any statements or documents upon which the plaintiff relied in bringing suit. A defendant normally cannot introduce additional evidence in support of a Rule 12(b)(6) motion without converting the motion into a Rule 56 motion for summary judgment. *See Hishon,* 467 U.S. at 73, 104 S.Ct. at 2232–33; *Easton v. Sundram,* 947 F.2d 1011, 1014–15 (2d Cir. 1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). In certain situations, however, consideration of materials other than the complaint is allowed. If a plaintiff has selectively introduced material in the complaint but has omitted critical portions of the documents, the defendant is allowed to introduce the full text of the materi-

---

**1.** The individual defendants are officers of Hunter or Hunter Industrial Facilities, Inc. Named in the body of the Consolidated Class Action Complaint are Oliver A. Kimberly, Jr., Dennis S. Oistacher, Keith C. Price, John M. Benz and Gregg T. Davis. (Compl., filing 22, at ¶¶ 8–12).

**2.** The Consolidated Class Action Complaint (document 22) proposes two classes. The first class

consists of all persons other than the defendants who purchased stock in Hunter on the open market during the period from November 13, 1992, to January 6, 1993. The second class is comprised of those investors who purchased stock during the alleged insider trading period between December 7, 1992, and January 6, 1993. Neither class has been certified.

al for the court's consideration. *See, e.g., Branch v. Tunnell,* 14 F.3d 449, 453–54 (9th Cir.) (holding that a court could consider the full text of partially quoted materials to decide if the plaintiff could possible prove its claim), *cert. denied,* —— U.S. ——, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994); *Pension Benefit Guaranty Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993) (holding that a court could look at the full text of documents the plaintiff relied upon), *cert. denied,* —— U.S. ——, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 n. 3 (1st Cir.1991) (holding that the defendant could submit the whole document if the plaintiff quoted only a part of it); *Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1015 (1st Cir.) (holding the defendant could introduce a full copy of the documentation if the plaintiff relied upon it in the complaint), *cert. denied,* 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988); *Feinman v. Schulman Berlin & Davis,* 677 F.Supp. 168, 170 n. 3 (S.D.N.Y. 1988) (holding defendant could produce documents even if the plaintiff did not explicitly name them). In cases of securities fraud in particular, the failure to view additional evidence would prevent a court from ever dismissing complaints which selectively quoted portions of a company's filings. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991). As a result, a trial court can "take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC." *Id.*

■ The Second Circuit has further explained what types of documentation a court can view in passing upon a motion to dismiss. In *Kramer,* the court stated that a court could view SEC filings even if the plaintiff did not specifically cite them in the complaint. *Id.; see also Menowitz v. Brown,* 991 F.2d 36, 39 (2d Cir.1993) (holding that the district court could look at all federally mandated disclosure documents); *Phillips v. Bureau of Prisons,* 591 F.2d 966, 969 (D.C.Cir.

1979) (holding that a court could look at any matter in the public record). When viewing these additional documents submitted by the defendant, the court can examine the "full text" of the quotations and references which are integral to the plaintiff's claims. *Ferber v. Travelers Corp.,* 802 F.Supp. 698 (D.Conn. 1992).[3]

■ If the defendants have submitted any additional material that the court feels it cannot consider in a 12(b)(6) motion, the court has the discretion to either ignore the material or convert the motion into one for summary judgment. *See Kopec v. Coughlin,* 922 F.2d 152, 155–56 (2d Cir.1991); *Chem–Tek v. General Motors Corp.,* 816 F.Supp. 123, 126 (D.Conn.1993).

■ Finally, after viewing these additional documents, the court need not continue to blindly accept the factual scenario that the plaintiff has spelled out. If the full text of the additional documents reveal that the plaintiff cannot possibly prove a claim, then the claim will be dismissed. *See Barnum v. Millbrook Care Ltd. Partnership,* 850 F.Supp. 1227, 1232–33 (S.D.N.Y.) (holding that if the allegations in the complaint are contradicted by the documents, the documents control), *aff'd,* 43 F.3d 1458 (2d Cir. 1994); *Ferber,* 802 F.Supp. at 702. In other words, if the documents portray a picture substantially different from that painted by the plaintiff in the complaint, the court will base its decision on the scenario supported by the complete exhibits.

■ Plaintiffs contend that the material submitted by the defendants in this case requires the court to convert defendants' motion to a Rule 56 motion for summary judgment. The court does not agree. Consistent with the above analysis, the court will take into account the following exhibits introduced in defendants' memorandum: (1) Hunter's relevant filings with the SEC[4]; (2) Hunter's

---

**3.** The court also can consider the transcripts from proceedings in state courts and administrative bodies. *See, e.g., Mack v. South Bay Beer Distribs., Inc.,* 798 F.2d 1279, 1282 (9th Cir. 1986) (holding that the district court could take into account the proceedings in a state administrative hearing when ruling on a 12(b)(6) motion).

**4.** Def's. Exs. A, C.

1992 annual report[5]; (3) the documents from the Texas administrative hearings[6]; and (4) Hunter's press releases of October 14 and December 11, 1992.[7]

## III. FACTS

Examination of the relevant record reveals the following facts. During 1989–1990, Hunter made a decision to focus the operations of its subsidiary, Hunter Industrial Facilities, Inc. ("HIFI"), on the development of a publicly held waste disposal facility. (Compl. ¶ 7).[8] The facility would be designed to utilize existing underground salt caverns for the disposal of hazardous waste. HIFI's plan (the "Project") also contemplated the development of industrial parks adjacent to the waste-disposal facilities and the storage of natural gas and other petro-chemical products. The first facility was to be located in Liberty County, Texas, approximately five miles northwest of the city of Dayton. (*Id.*).

In order to build the Project, Hunter needed to obtain the appropriate permits from the Texas Water Commission ("TWC"). To attain the permits, Hunter had to participate in a series of evidentiary hearings before a hearing examiner ("Examiner") and the Executive Director ("Director") of the TWC. At the relevant point in time, the TWC had never before applied the recently amended Texas Hazardous Waste Disposal Act of 1991. After initial delays, the Examiner began the evidentiary portion of the proceedings on June 29, 1992. (Compl. ¶ 55). The hearing concluded on October 1, 1992. (Compl. ¶ 66). During the course of the proceedings, Hunter informed its shareholders and the general public that the hearings were proceeding favorably and that it anticipated receipt of the permits. (Compl. ¶¶ 55,

56, 72). At the close of the hearing, the Director of the TWC staff was opposed to awarding the permits. (Compl. ¶ 70). On December 10, 1992, the Examiner recommended to the TWC that it grant the permits necessary to construct and operate six of the proposed disposal facilities. (Compl. ¶ 78).

Both the Examiner and the Director reported their decisions to the three commissioners of the TWC, who had to make the final determination on whether to grant the necessary permits. While Hunter was awaiting the final determination on its pending permits, it again informed its shareholders that it believed the permits would be approved. (Compl. ¶¶ 80, 81).

As of September 30, 1992, there were approximately 17,657,000 shares of Hunter common stock outstanding, held by in excess of 1,800 shareholders. (Compl. ¶ 7(b)). The plaintiffs allege that, beginning on December 7, 1992, three days prior to the Examiner's recommendation, and for a period of approximately one month, the individual defendants sold approximately 576,000 shares of Hunter common stock on the open market without making disclosure of adverse material facts that were known or available to the defendants.[9] On January 7, 1993, the TWC denied Hunter's application for the Project permits, and the price of Hunter's stock fell from the $5 11/16 per share closing price of the previous day to $1. (Compl. ¶ 97). This action immediately followed.

## IV. DISCUSSION

### A. LIABILITY UNDER § 10(b) AND RULE 10b–5

 Plaintiffs have alleged that Hunter has violated SEC Rule 10b–5,[10] which in turn

---

5. Def's. Ex. B.

6. Def's. Exs. G, H, I.

7. Def's. Exs. D and J, respectively.

8. References denominated "Compl." are to the Consolidated Class Action Complaint filed April 5, 1993.

9. More than half of the sales (303,000) were made by Defendant Kimberly "or Kimberly, Cox

& Harnish, Inc." (Compl. ¶ 8). The Complaint does not name the latter entity as a defendant and states only that Defendant Kimberly is the "President, a director and 40% shareholder" of Kimberly, Cox & Harnish. (*Id.*) Thus, it is not clear what number of shares, if any, were sold personally by Defendant Kimberly. Nevertheless, for purposes of the pending motion the court accepts the plaintiffs' inference that Defendant Kimberly directed the sale of stock.

10. Rule 10b–5 states that it is unlawful to "make any *untrue statement of a material fact or to omit*

triggered a violation of § 10(b) of the Securities and Exchange Act of 1934. 15 U.S.C. § 78j.[11] In order to prevail on their claims, the plaintiffs must establish that Hunter violated the Act by making either material omissions or material misrepresentations with scienter, and that reliance on the defendant's action caused plaintiffs injury. *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996).[12] Thus, the court turns first to whether any alleged omissions on the part of Hunter were both material and misleading, and then turns to an analysis of Hunter's affirmative statements which the plaintiffs allege were fraudulent.

### 1. Material Omissions

▇▇▇ Plaintiffs allege that Hunter failed to inform the shareholders of the danger of not getting final permits. (Compl. ¶ 82). Under § 10(b), information is material "only if its disclosure would alter the 'total mix' of facts available to an investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment decision." *Ferber*, 802 F.Supp. at 705 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988)); *see also Herzfeld v.*

*Laventhol, Krekstein, Horwath & Horwath*, 540 F.2d 27, 33 (2d Cir.1976) (holding that the plaintiff must show that the information or omission was a substantial factor in a decision to invest).

▇▇▇ The evidence submitted by the defendants invalidates plaintiffs' claim that Hunter failed to give vital information that would have altered the "total mix" of information available to investors. As in *Ferber*, where the court held that the defendant's failure to report one percent of its mortgages did not constitute a material omission since it would have made no difference to investors, here anything Hunter may have omitted would not have changed the reasonable expectations of the shareholders. *See Ferber*, 802 F.Supp. at 708.

Hunter warned potential investors that the 1991 amendments to applicable Texas law imposed a new series of requirements which had to be satisfied before the permits would be issued.[13] In addition, Hunter gave more than ample warning in both the SEC filings and in its 1992 Annual Report that there could be no guarantee or "absolute assurance" that "HIFI will receive final hazardous

to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

**11.** Section 10(b) of the Act provides the following:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— ... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

**12.** The plaintiffs assert a fraud-on-the-market theory of liability in this case, and thus the individual plaintiffs need not show that they them-

selves relied on any particular misrepresentation by the defendant. This theory allows the plaintiffs to base the reliance element of their claim on a defendant's fraudulent manipulation of the integrity of the market.

**13.** In both its June 29, 1992, 10–K Statement and its 1992 Annual Report, Hunter stated:

The legislation enacted in June 1991 included provisions which, among other things, (1) imposed a 120 day moratorium on the permitting of all new commercial hazardous waste incinerators and injection wells pending completion of a detailed rule making process, ... (4) requires that applicants for permits ... demonstrate that they have access to sufficient financial resources to construct and operate the commercial hazardous waste disposal facilities, ... (7) requires that applicants ... demonstrate and the TWC find that an urgent public necessity exists for the disposal of hazardous waste in underground salt domes caverns, based on a substantial and obvious need for the facility in the State of Texas....

Defs.' Ex. A at 8; *see also* Defs.' Ex. B at 16.

waste disposal permits." (Defs.' Ex. A at 11; Defs.' Ex. B at 19).[14]

Hunter not only warned its shareholders that the receipt of the permits was a long and arduous process, (Defs.' Ex. A at F–33), but also distinctly informed them that there was significant public opposition to the Project, stating that "[t]here appears to be significant public opposition to the issuance of final hazardous waste disposal permits, which could delay or impede HIFI's ability to obtain final hazardous waste disposal permits." (Defs.' Ex. A at 7; see also Defs.' Ex. C at 18). After it became clear to Hunter that the Director and other staff members of the TWC were opposed to the Project permits, Hunter again informed its shareholders of the potential danger in its quarterly report filed with the SEC on November 13, 1992. "Based on the status of the hazardous waste disposal permitting process, as discussed herein, management believes that, at this time, it cannot reasonably predict whether HIFI will receive final hazardous waste disposal permits or if such permits, if issued, will contain unacceptable conditions." (Def's. Ex. C at 18–19).[15]

Plaintiffs state that Hunter cannot be absolved from liability simply because it "bespoke caution" in general terms. See In re Donald J. Trump Casino Sec. Litig., 793 F.Supp. 543, 553–54 (D.N.J.1992) ("[T]he 'bespeaks caution' doctrine applies only to precise cautionary language which directly addresses itself to future projections, estimates or forecasts in a prospectus. A blanket warning that the within investment is 'risky,' for example, would be insufficient to ward against a federal securities fraud claim."), aff'd, 7 F.3d 357 (3d Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). As shown above, however, Hunter gave far more than a "blanket warning." On the contrary, Hunter repeatedly gave precise warnings about the uncertainty of the permit process.

Plaintiffs cite TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), in support of their contention that materiality is properly a jury question and thus cannot be decided by the court in ruling on a motion to dismiss. It is true that the TSC Court held that the issue of materiality is a mixed question of law and fact, involving the application of a legal standard to a specific set of facts. Id. at 450, 96 S.Ct. at 2132–33. The Court also stated, however, that when "the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' ... the ultimate issue of materiality [is] appropriately resolved 'as a matter of law.'" Id. (quoting Johns Hopkins Univ. v. Hutton, 422 F.2d 1124, 1129 (4th Cir.1970)). There is no doubt that the converse also is true. As the Third

**14.** In addition, Hunter stated at various times that "there can be no absolute assurance that the hazardous waste disposal permit applications will not be dismissed.... The dismissal of the hazardous waste disposal permit applications could have a material and adverse effect on HIFI and Hunter." (Def's. Ex. A at 10). Hunter further stated that:

> [T]he use of underground salt dome caverns for the disposal of solidified hazardous waste is a new business and faces the inherent risks associated with developing a new market including, but not limited to, the risk of unanticipated costs, government regulation, obtaining needed financing, obtaining necessary hazardous waste disposal permits and authorizations, and other similar risks.

(Defs.' Ex. A at 11–12; see also Defs.' Ex. B at 19).

**15.** Plaintiffs' assertion that Hunter did not inform them of the TWC's opposition to the Project is simply untrue. Defendant informed them that "the staff of the TWC has indicated to management that HIFI has not demonstrated in the hazardous waste disposal permit applications that sufficient financial commitments or resources are available to construct, safely operate and properly close the hazardous waste disposal facility...." (Defs.' Ex. A at 9). Moreover, in its 10–Q Statement filed November 13, 1992, Hunter clearly presented the fact that Hunter's application was opposed by the staff of the TWC. (Defs.' Ex. C at 15–17). It is difficult to understand how the statement "the Executive Director ... is stating for the first time that he believes the ... permits should be denied" could be perceived as stating anything other than what is says. (Id. at 17). The fact that Hunter presented one facet of disagreement between the staff and itself—the "Financial Assurance Issue"—as a conflicting interpretation of Texas law simply does not alter that the fact of disagreement was disclosed. Although not entirely relevant, it is notable that Hunter's interpretation eventually prevailed. Hunter Indus. Facilities, Inc. v. Texas Natural Resource Conservation Comm'n, 910 S.W.2d 96, 109 (Tex.Ct.App.1995).

Circuit stated in *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 (3d Cir.1989), materiality can be decided as a matter of law if "reasonable minds cannot differ" as to the effect of the information or omission on the shareholders. In the case at bar the court finds that the issue of materiality can be decided as a matter of law.

Reasonable minds could not differ in finding that any omission regarding the uncertainty of the permit process in Hunter's October 14, 1992, press release was immaterial as a matter of law. *See TSC,* 426 U.S. at 450, 96 S.Ct. at 2132–33; *Craftmatic,* 890 F.2d at 641. Hunter's warnings were not of the generic variety which have been found insufficient. *See, e.g., Pommer v. Medtest Corp.,* 961 F.2d 620, 624–25 (7th Cir.1992). On the contrary, to the extent plaintiffs argue that Hunter failed to disclose information regarding the uncertainty of the permitting process in any particular statement or document, the omission is excused since the "information [was] made credibly available to the market by other sources." *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1115 (9th Cir.1989) (citing *TSC,* 426 U.S. at 449, 96 S.Ct. at 2132), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).

▇▇▇ Similarly, even if any of the alleged omissions were material, they did not mislead investors because of the total mix of information available in the market and therefore are unactionable. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). It would be erroneous to conclude that an omission was misleading if it did not "significantly affect[ ] the total mix of information available to the market." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1420 (7th Cir.1992). The existence of information in public filings concerning the risk involved in the permitting process precludes any claim based on an omission in the press release or other correspondence with the shareholders. *See Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 517 (7th Cir.1989) ("It is pointless and costly to compel firms to reprint information already in the public domain."). As another court aptly stated in a similar situation, "[c]orporations are not required to address

their stockholders as if they were children in kindergarten." *Richland v. Crandall,* 262 F.Supp. 538, 554 (S.D.N.Y.1967). It seems beyond doubt that plaintiffs cannot prove any set of facts that would support their claim that Hunter omitted material facts which in turn misled investors.

### 2. Material Misstatements

Plaintiffs have also alleged that Defendant violated 17 C.F.R. 240.10b–5 by making material misrepresentations in its SEC filings, its 1992 Annual Report, and its press releases. The alleged misrepresentations consist of the following: (1) Hunter said that it had "made all the demonstrations required by law for issuance of the final permits and had 'gone well beyond the minimum standards required' to obtain the permits," (Compl. ¶ 90); (2) Hunter said that it "had the safest method for disposing of hazardous waste" and that "the project was state-of-the-art and was a safe and proven technology," (Compl. ¶ 91); (3) Hunter stated that "it had the best experts," (Compl. ¶ 91); and (4) Hunter claimed that "the TWC can only reject the hearing examiner's recommendations under certain narrow circumstances." (Compl. ¶ 92). In order to be actionable as securities fraud, statements must be both material and misleading. *See* 17 C.F.R. 240.10b–5(b). This court is willing to grant that the above statements were all material, since they would have affected a shareholder's decision to invest. *See Herzfeld,* 540 F.2d at 33–34; *Ferber,* 802 F.Supp. at 705. Thus, the court must now turn to whether or not the statements could reasonably be seen as misleading.

As explained below, each of Hunter's statements in question was actually an expression of opinion or belief. Such expressions are sometimes actionable as material misrepresentations under the securities laws. *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1093, 111 S.Ct. 2749, 2758–59, 115 L.Ed.2d 929 (1991) ("[C]onclusory terms [such as "high value" or "fair terms"] in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading.... [E]xpressions of

such judgments can be uttered with knowledge of truth or falsity just like more definite statements. . . ."). Hence the issue here turns on whether Hunter knew or should have known that its beliefs and opinions were false. *See Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 283 (3d Cir.) (holding that the defendant's beliefs stated a cause of action if it knew they were inaccurate), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *DeSalle v. A.G. Edwards & Sons, Inc.,* 804 F.Supp. 436, 438 (D.Conn.1992) (holding that opinions and forecasts were only actionable if the company " 'disseminated the forecasts knowing that they were false or that the method of preparation was so egregious as to render their dissemination reckless' ") (quoting *Ciresi v. Citicorp,* 782 F.Supp. 819, 822 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1161 (2d Cir.1992)); *see also Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 117 (2d Cir.1982).

The court now turns to an examination of each of Hunter's statements to examine "the nature of the prediction—with the emphasis on whether the prediction suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis." *Isquith v. Middle South Utils., Inc.,* 847 F.2d 186, 204 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988).

### a. "Hunter Had Made All the Demonstrations Required by Law"

██ Plaintiffs quote the above-mentioned representation from one of Hunter's SEC filings, and state that Hunter either knew or should have known that it had not made all the demonstrations that it possibly could. (Compl. ¶¶ 75, 90). A reference to the full sentence, however, reveals that the statement was clearly a belief: "Management *believes* that HIFI, has made all of the demonstrations required by applicable law for the issuance of final hazardous waste disposal permits," but Hunter could not "reasonably predict" whether it would even get the permits. (Def's. Ex. C at 15 (emphasis added)). This is clearly a belief and not a positive statement that Hunter had done everything it possibly could. It is also couched in adequate cautionary language to indicate that it

is not a guarantee. *See Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986).

The next issue, then, is whether this belief was a reasonable one. This statement was made after the close of the Texas permit hearing, and the Examiner actually recommended approval of the permit applications; therefore, it obviously must have been reasonable for Hunter to believe it had fulfilled the requirements for the permits. The Examiner's Proposal for Decision stated that the Examiner "conclude[s] that the applicant has competently presented a technically sound case through the expert testimony of distinguished and credible experts in their respective fields. The Examiner[ ] believe[s] that the applicant had adequately addressed the important items of concern raised by Commission staff during the hearing. . . ." (Def's. Ex. H at 3). Thus, there can be no doubt that it was reasonable for Hunter to believe that it had competently presented its case. *See DeSalle,* 804 F.Supp. at 438.

### b. "Hunter Has the Safest Method of Disposal and Has State of the Art Technology"

██ Plaintiffs aver that Hunter stated it had the safest disposal method available. (Compl. ¶¶ 67, 91). As above, though, the full sentence from which Plaintiffs quote, made after the end of the permit hearing, establishes that this was merely Hunter's opinion: "We *believe* we have proven that we have the safest solution to the problem of hazardous waste disposal and that there is an urgent need for our facility." (Def's. Ex. D (emphasis added)). Thus, the relaxed standard regarding the expression of opinion is clearly applicable here.

As to the reasonableness of Hunter's belief, the Examiner's Proposal for Decision is illuminating once again. The Examiner stated that the "HIFI facility would be more environmentally protective than other disposal technologies." (Def's. Ex. G at 2). If the Examiner itself found Hunter's proposal to be safer than many of the other options, then no one could reasonably say that Hunter was reckless in forming that opinion itself.

Regarding Hunter's assertion that its technology was state of the art, this quotation is

taken from the company's 1992 Annual Report. Again, it is in fact an opinion of what Hunter's experts were attempting to demonstrate in the TWC hearing. Hunter stated that the hearing would provide a forum where the experts could show that the project "is a state of the art, world class facility which will utilize safe and proven technologies to solve" the waste disposal problem. (Def's. Ex. B at 2). Regarding Hunter's reasonableness, as stated above, the Examiner thought that Defendant's plan for waste management was superior to most others. As such, there is no doubt that Hunter's opinion regarding the technology's capabilities was reasonable.

#### c. "Hunter Has the Best Experts"

■ Plaintiffs state that Hunter misled them when it claimed to have the best experts available. (Compl. ¶ 91). This is a reference to a line in Hunter's 1992 Annual Report were Defendant claimed it had "some of the best scientific experts in the country" prepared to testify at the Texas hearing. (Def's. Ex. B at 2). This type of corporate "puffing," whether it was a statement or mere belief, is normally unactionable. *See Shapiro*, 964 F.2d at 283–84 n. 12.

In any event, Hunter's "puffing" was clearly reasonable in light of the Examiner's statements during the hearing. The Examiner characterized Hunter's experts as "leading authorities" who offered "credible evidence." (Def's. Ex. G at 3). In addition, the Examiner said that they were "distinguished and credible experts in their respective fields." (Def's. Ex. H at 3). Finally, the Examiner stated that one of Hunter's experts, a Dr. Hirschhorn, was "extremely knowledgeable in this field." (Def's. Ex. H at 12). Thus, this court finds that Hunter's

"puffing" in this instance was also clearly reasonable and unactionable. *See Philip Morris Cos.*, 75 F.3d at 811.

#### d. "The TWC Can Only Reject the Examiner's Recommendations Under Certain Narrow Circumstances"

■ Plaintiffs allege that the above sentence constitutes a misleading and unreasonable opinion. (Compl. ¶ 92). As stated above, in 1991 the Texas legislature amended the applicable TWC statute, limiting the commission's ability to overturn the Examiner's recommendations.[16] At the time the defendant made the quoted comment no Texas court had yet interpreted this amended statute. Hunter did clearly spell out the three situations in which the TWC could overturn the Examiner's finding. (Def's. Ex. H at 12). As a matter of law, Hunter cannot be held liable for stating a belief that the exceptions in which the TWC could overturn the Examiner's recommendation were "narrow." Before the 1991 amendment, the TWC could overturn an Examiner's recommendation for any reason whatsoever. Since the amendment limited the TWC's power of reversal to specific, narrowly defined scenarios, Hunter's belief was a reasonable one. *See Hunter Indus. Facilities, Inc. v. Texas Natural Resource Conservation Comm'n*, 910 S.W.2d 96, 102 (Tex.Ct.App.1995) (holding amendment to Texas law "curtailed the [TWC's] discretion to overturn the examiners' findings and conclusions").

None of the fraudulent statements alleged in this case as fraudulent are actionable. Taken together, the totality of the statements do not establish an attempt on the part of Hunter to mislead the market. Plaintiffs, therefore, have no cause of action based on any of Hunter's affirmative statements.

16. The amended statute reads, in relevant part, as follows:
(c) The commission may overturn an underlying finding of fact that serves as the basis for a decision in a contested case only if the commission finds that the finding was not supported by the great weight of the evidence. (d) The commission may overturn a conclusion of law in a contested case only on the grounds that the conclusion was clearly erroneous in light of precedent and applicable rules.

(e) If a decision in a contested case involves an ultimate finding of compliance with or satisfaction of a statutory standard the determination of which is committed to the discretion or judgment of the commission by law, the commission may reject a proposal for decision as to the ultimate finding for reasons of public policy only.
Tex.Health & Safety Code Ann. § 361.0832 (West 1992).

## B. FRAUDULENT INTENT

Federal Rule of Civil Procedure 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularly. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *See DeSalle,* 804 F.Supp. at 438. In the present matter, plaintiffs have stated the circumstances with sufficient particularity.[17] In addition, it is axiomatic that a plaintiff cannot normally get inside a defendant's head to know exactly what he knew or planned. *See Devaney v. Chester,* 813 F.2d 566, 568 (2d Cir.1987) (holding that the plaintiff could not realistically plead the defendant's actual state of mind); *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987) (holding that the plaintiff did not have to plead scienter in a fraud case with "great specificity"); *Goldman v. Belden,* 754 F.2d 1059, 1070 (2d Cir.1985) (holding that intent and knowledge could be averred generally). Indeed, the Supreme Court has stated that the "proof of scienter required in fraud cases is often a matter of inferences from circumstantial evidence. If anything, the difficulty of proving the defendant's state of mind supports a lower standard of proof." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390–91 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983).

Even this "lower standard," however, still requires that there be a "strong inference" of intent to defraud. *See Kramer,* 937 F.2d at 776. In the context of securities fraud, scienter is defined as the "intent to deceive, manipulate or defraud." *Arthur Lipper Corp. v. SEC,* 547 F.2d 171, 181 (2d Cir.1976), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). Scienter is not established by simply stating that the defendant's statements were misleading. *See Decker,* 681 F.2d at 115; *see also Ferber,* 802 F.Supp. at 712 (fraud claims cannot be based on speculation or pure conclusory allegations). To establish scienter, plaintiffs must "either (1) identify circumstances indicating conscious or reckless behavior by the

defendants, or (2) allege facts showing a motive for committing fraud and a clear opportunity for doing so." *Philip Morris Cos.,* 75 F.3d at 813. The mere fact that the permits were ultimately denied does not mean that defendant intended to defraud the market. *See Kramer,* 937 F.2d at 776 ("It is in the very nature of securities markets that even the most exhaustively researched predictions are fallible."). There must be evidence of a clear intent to deceive, defraud or manipulate the market. *See Ferber,* 802 F.Supp. at 712. Thus, "while Rule 9(b) permits scienter to be demonstrated by inference, this 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991) (quoting *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990)).

In the present matter, plaintiffs have alleged that Hunter made misrepresentations and omissions knowing that the permits would fail in order to defraud the market. This court, however, already has found that Hunter did not make any material omissions or misstatements. This being the case, Hunter could not have had knowledge that it was disseminating misleading information. If Hunter had known it was misleading the market, and had wanted to do so, it would not have included the wealth of warnings which have been mentioned above, since that may well have dissuaded a portion of the public from investing in the company.

The fact that Hunter made money off of the shareholders' investments, without more, is not enough to establish a "strong inference" that defendant had intent to defraud the market. As stated above, Hunter gave a plethora of warnings about the risk involved in the investment, thus negating any general averment of fraudulent intent or knowledge. *Cf. Kramer,* 937 F.2d at 778 (noting that in light of full disclosure by defendants "there is no hint of any intent to deceive").

---

**17.** The complaint is sixty-two pages long and sets forth approximately 136 separate factual allegations.

▇ The plaintiffs' complaint is based on a fraud on the market. Fraud, however, "can only be perpetrated upon the market if that market does not have material information or has incomplete or inaccurate information." *In re Philip Morris Sec. Litig.*, 872 F.Supp. 97, 102 (S.D.N.Y.1995), *aff'd in relevant part sub nom. San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir.1996). Careful review of the record reveals that the this was not the case here. The complaint therefore fails to plead fraud in conformity with Fed.R.Civ.P. 9.

## C. LIABILITY UNDER § 20

▇ Under § 20 of the Act, 15 U.S.C. § 78t, individual corporate officials can be held liable for the fraudulent acts of their respective companies if they were in a controlling position.[18] An implicit prerequisite to individual liability, however, is the potential for primary liability. *See Brown v. Hutton Group*, 795 F.Supp. 1317, 1324–25 (S.D.N.Y.1992) ("[I]t is impossible to state a claim for secondary liability under § 20 without first stating a claim for some primary violation of the security laws on the part of the controlled party."); *see also Ferber v. Travelers Corp.*, 785 F.Supp. 1101, 1111 (D.Conn.1991) ("claims for secondary liability must be dismissed when primary violation claims are dismissed"); *Goodman v. Shearson Lehman Bros., Inc.*, 698 F.Supp. 1078, 1086 (S.D.N.Y.1988) (holding that the plaintiff could not maintain controlling person liability against individuals after the court had dismissed the claims against the controlled company). Thus, in this case, since the court has found that Hunter is not liable, the individual defendants are not liable for securities fraud.

## D. LIABILITY UNDER § 20A

Plaintiffs also have brought a claim against the individual defendants under § 20A(a) of the Act, which affords a private right of action against:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable ... to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased ... securities of the same class.

15 U.S.C. § 78t–1. The defendants argue that this claim is derivative of the primary fraud claim and must be dismissed. *See, e.g., Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 704 (2d Cir.1994) (holding "to state a claim under § 20A, [plaintiffs] must plead as a predicate an independent violation of the [19]34 Act."); *see also In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir.1993); *In re Storage Technology Corp. Sec. Litig.*, 804 F.Supp. 1368, 1374 (D.Colo. 1992). In light of the full disclosure to the market by Hunter of the dangers inherent in the permit process, the court need not decide this issue.

▇ A corporate insider is prohibited from trading on confidential information without disclosing the information to the shareholders. *Philip Morris Cos.*, 75 F.3d at 814. The insider trading claim alleged by the plaintiffs in this case is predicated on the defendants' alleged breach of their duty to refrain from trading without disclosing material adverse information. (Compl. ¶¶ 128–130). The only concrete allegation in the plaintiff's complaint regarding the information allegedly withheld by the defendants is that the defendants knew Hunter had not met the requirements necessary to receive the permits and represented that Hunter had done so. (Compl. ¶ 128).

The force of the insider trading theory is deflated significantly by the allegations of the complaint itself. Had the Examiner recommended denial of Hunter's application, there

---

**18.** Section 20 provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

would be at least *some* permissible inference of conscious wrongdoing. The fact that the defendants sold stock beginning three days prior to the Examiner's *favorable* recommendation on December 10 seems an insurmountable hurdle to plaintiffs' claim that the defendants were basing their decisions on inside information. (Compl. ¶ 15).

Notwithstanding the inherent weakness in plaintiffs' theory, the court finds that the allegation of nondisclosure does not survive the resolution of the fraud claims. To the extent there existed an affirmative duty to disclose in this case, the record plainly reveals that Hunter disclosed all material facts regarding the risks entailed in the permit process.

## E. UNJUST ENRICHMENT

The complaint also states a common law claim for unjust enrichment against the individual defendants. To the extent this count can survive the court's ruling on defendants' motion to dismiss, the court declines to exercise jurisdiction over the claim, and it is dismissed without prejudice to its pursuit in state court. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## V. CONCLUSION

For the reasons state above, the defendants' motion to dismiss (**document # 28**) is hereby **GRANTED,** and the complaint is dismissed in its entirety. The Clerk shall enter judgment on behalf of the defendants and close the file in this all related cases.

It is so ordered.